[Crim. No. 29283. Second Dist., Div. Two. Apr. 18, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE SIMON WEIN, Defendant and Appellant.

**COUNSEL**

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Marc E. Turchin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COMPTON, J.**—A jury found defendant guilty of the following charges: (1) burglary of the first degree; (2) robbery of the first degree; (3) forcible oral copulation; (4) attempted murder, and (5) murder of the first degree. Defendant had previously admitted 15 prior felony convictions.

*The victim in each of the first four charges was one Marie DeHaaff* and the jury found as to the robbery and burglary that the defendant intended to and did inflict great bodily injury. The victim in the murder charge was one Dorothy George.

### THE MURDER

Dorothy George lived with her husband of 20 years at a residence in Los Angeles approximately 3 miles from the Los Angeles International Airport. In addition to being a homemaker Mrs. George worked part time baby sitting at the YMCA for which work she received $2 an hour. Mrs. George had a long-standing habit of saving money from both her weekly household expense allowance and her part time employment pay. From this fund she purchased gifts for others.

Several weeks prior to August 8, 1975, she had told her husband she was saving her baby sitting money for something that she intended to buy. She told her daughter that she had been saving for a trip to Idaho but had changed her mind and thought she would save this money and use it "for Christmas presents for my dad." The daughter in prior conversations with her mother learned that the mother had a habit of keeping the money in a hiding place in the bedroom.

On July 28, 1975, Mrs. George went to the Ralphs Market located near her home where she posted a 3 × 5 card on a bulletin board advertising that she had an orange lounge chair for sale. The card contained the price and her home telephone number.

On August 8, 1975, defendant drove some friends to the Los Angeles·International Airport at around noon. He dropped them off and left. At about 1:30 p.m. that same day a neighbor who lived across the street from the George residence observed an unfamiliar car parked in front of the house. The car remained there until about 4:50 p.m. when the neighbor observed a man come out of the George residence and drive

away. The neighbor then placed a phone call to the George residence but received no answer. This neighbor and another neighbor were later to testify that the man seen leaving resembled the defendant and that the automobile resembled the defendant's car although they were unable to positively identify either.

Mr. George, the victim's husband, returned home sometime around 5 p.m. on August 8. The front door was slightly ajar and as he entered he noticed that the hallway floor was wet. He went to the bathroom and there found his wife lying face down in the bathtub which was filled with water. She was dead. Mrs. George was fully clothed except for her shoes. In the bathtub was a piece of sheet which had been ripped from a sheet which was also in the tub. A blanket and several towels along with a piece of cord or twine were in the tub.

In the den next to the chair which had been offered for sale was another piece of cord or twine which had not previously been in the house. A flashlight which belonged to the Georges and which was ordinarily kept in the garage was found in the den on the floor next to the orange chair. There were no signs of forced entry or of a struggle. A search of the house revealed that the money which Mrs. George had been saving was gone.

Mrs. George's body exhibited signs of ligature marks on her wrists and ankles. An autopsy revealed the cause of death to be strangulation due to the application of a ligature around the neck. That examination disclosed six different traumatic areas indicating that the deceased had been struck on the head while she was still alive with an object similar to the flashlight. There was a superficial puncture wound in the abdomen which could have been caused by the tip of a knife. No traces of sperm or semen were found on the body.

THE REMAINING COUNTS

On September 5, 1975, Miss DeHaaff was living in an apartment in the Culver City-Palms area which is also relatively close to the airport. Approximately a week before she had placed on the bulletin board of a Vons Market located about a block from her apartment a 3 × 5 card upon which she advertised for sale a king size bed, some ladies clothes and a pair of ski boots. The card contained her telephone number.

On September 5, 1975, at about 11 a.m., defendant called Miss DeHaaff on the telephone and stated that he wanted to come over to talk to her concerning the bed which she advertised for sale. At about 1:30 p.m. defendant arrived at Miss DeHaaff's apartment. He was ushered into the bedroom where he examined the bed. He stated that he liked the bed but had to check with his wife before he could complete the purchase. He asked Miss DeHaaff if she would be home the following day and she told him that she would.

The two then returned to the living room of the apartment at which time defendant inquired as to what type of casters were on the bed. They both then went back into the bedroom to look at the casters. Miss DeHaaff returned to the living room and shortly thereafter defendant came into the living room. He was holding his watch and stated that he had lost his watch stem.

Miss DeHaaff then began to look for the watch stem on the floor of the bedroom and was on her hands and knees when defendant grabbed her from behind, placed his left hand over her mouth and with his right hand held a knife to her throat. He ordered the victim to the floor on her stomach and tied her hands and ankles with rope that he had brought with him.

Defendant said he needed money desperately. When Miss DeHaaff indicated there was some money in a book behind a night stand defendant dragged her to that area, picked up the book, took the money out and wiped the book with a cloth. The book contained from $20 to $40.

Defendant then gagged the victim with a pillow case that he took from the bed and began to drag her toward the bathroom. He announced that he wanted to have sex with her. He unzipped his pants and placed his penis in her mouth ordering her to "suck me." Defendant never achieved a full erection nor did he have an emission.

Defendant then stated he was going to wash up and asked where the towels were. After washing defendant put toilet paper in Miss DeHaaff's mouth and wrapped two wet towels around her head and began to suffocate her. Defendant dragged the victim into the hallway and told her that as soon as she stopped breathing he would leave. He was very upset that she was still alive. Defendant stabbed Miss DeHaaff four times in the area of her neck and dropped a flower pot on her head.

Defendant then announced that he wanted to take a shower with the victim. He went to the bathroom and she heard water running in the bathtub. At this point defendant was apparently frightened off by the noise of a door slamming—which noise sounded as if it came from the DeHaaff apartment.

Defendant had been living only 5/10 of a mile from the market where Miss DeHaaff had posted her card and about 6/10 of a mile from the DeHaaff residence. When defendant was arrested he was wearing a gold Hamilton watch and in his room he had another smaller watch.

In addition to the above testimony concerning the present offenses the prosecution offered evidence that in 1956 and 1957 the defendant committed four separate offenses, each of which were robberies and sexual assaults on women in their own homes. These were some of the offenses which comprised the 15 prior convictions.

Those cases each involved a woman who had advertised an item for sale by posting an ad in the paper. In each instance the defendant came to the residence of the victim under the pretense of examining the item for sale and in each case he told the victim that he had lost his watch stem, subdued the victim by grabbing her from behind, threatened her with a knife and bound her wrists and ankles with a ligature which he brought with him.

*In one of those cases the victim obtained a flashlight to use in the search for the watch stem.* In none of those cases did defendant have an orgasm or emission. Defendant's defense was essentially an alibi. He did not testify himself.

The defendant makes some 17 claims of error. The following contentions merit discussion: (1) there was insufficient evidence to support the conviction of murder, (2) it was error to admit the evidence of the prior uncharged offenses, (3) it was error to admit testimony concerning Mrs. George's habit of saving money, (4) the trial court erred in instructions regarding the felony-murder rule and the crime of attempted murder, and finally (5) that the judgment must be modified to comply with the requirements of Penal Code section 654.

## The Sufficiency of the Evidence

Defendant does not challenge the sufficiency of the evidence to support a conviction of the crimes committed against Miss DeHaaff. The evidence bearing on those charges is probative in the charge of the murder of Mrs. George.

■ In reviewing a judgment of conviction we ". . . view the evidence in the light most favorable to the People and presume in support of that judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Vann,* 12 Cal.3d 220, at p. 225 [115 Cal.Rptr. 352, 524 P.2d 824].)

As to the DeHaaff episode the evidence points to the following: (1) defendant selected the victim by means of an advertisement in a market near the victim's residence and near his own, (2) after gaining entrance to the residence on the pretense of looking at the item for sale, he surprised the victim from behind and prevented any struggle by getting her into a defenseless position looking for a "lost watch stem," (3) he robbed the victim of money which was concealed in the bedroom, (4) he bound the victim's wrists and ankles with cord which he brought with him, (5) he attempted to gag and suffocate the victim with material he found on the premises, (6) he cut the victim with a knife, (7) he struck the victim in the head with an object he found on the premises, (8) although his attack on the victim was sexually motivated, he left no evidence of sperm or semen, and (9) he was planning to drown his victim in the bathtub when he was scared off.

In the case of the murder of Mrs. George, defendant does not attack the sufficiency of the evidence to support a conviction of murder in the first degree. ■ His contention is that there is insufficient evidence to identify him as the perpetrator.

The objective evidence of the circumstances of the murder as testified to by Mr. George and the investigating police officers supports the following: (1) the perpetrator gained access to the residence under the pretext of looking at an item which was advertised for sale in a market near the victim's residence, (2) the victim was robbed of money that was secreted in the bedroom, (3) the victim was surprised and prevented from struggling or resisting, (4) the victim had obtained a flashlight to look for something even though it was daylight, (5) the perpetrator tied the victim's wrists and ankles with cord which he brought with him, (6)

the perpetrator used material from the premises to gag the victim, (7) the perpetrator struck the victim in the head, (8) the perpetrator stuck the victim with a knife, (9) the perpetrator drowned the victim in the bathtub.

To this very distinctive modus operandi we add the fact that the perpetrator was dressed similar to the manner in which the defendant was dressed at the time of the DeHaaff incident. The perpetrator looked similar to the defendant; drove a car similar to defendant's car and, in fact, defendant was in the vicinity of the George residence shortly before the murder occurred.

This combination of circumstances is powerfully persuasive of the conclusion that defendant was the perpetrator. Clearly the evidence which we have recounted is substantial and provides more than adequate support for the jury's finding that the crimes were all committed by one and the same person—this defendant.

## The Prior Uncharged Offenses

Defendant contends generally that it was error to admit the evidence of the prior offenses and especially it was error to admit that evidence as to the murder charge. Also, defendant claims that even if the evidence was admissible it was error to admit evidence of four previous crimes when one would have sufficed.

The issue is relevancy. Evidence that a defendant committed offenses other than the one charged is admissible if relevant to a material issue and excluded when its sole purpose is simply to show defendant's bad moral character. (See Witkin, Cal. Evidence (2d ed.) p. 300, and cases there cited.)

Evidence Code section 1101, subdivision (b), states that: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

Evidence of prior offenses is relevant and admissible where there is shown ". . . a unique methodology or peculiar behavior pattern which tends to identify the perpetrator of an earlier crime as the person who

perpetrated the crime charged." (*People* v. *Baskett,* 237 Cal.App.2d 712, 717 [47 Cal.Rptr. 274].)

Here the trial court made a preliminary determination of relevancy in a hearing conducted out of the presence of the jury as required by Evidence Code section 402. That court determined that the evidence of the prior offenses was relevant to the issue of the identity of the perpetrator of the charged offenses.

The trial court is vested with discretion in admitting or rejecting proffered evidence and its decision will not be reversed on appeal unless there is a manifest abuse of that discretion resulting in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, §§ 352, 353, 354.)

We have previously recounted the factors which made the defendant's method of operation in the prior offenses unique and peculiar to the extent that it constituted his trademark. The uniqueness is fortified by the unwavering consistency with which defendant employed the "lost watch stem approach" to get his victims in a defenseless position. Thus, it was relevant and proper to show that defendant did not simply use the technique on one prior isolated occasion but repeatedly used that technique.

Up to a point defendant's conduct in the DeHaaff incident was a carbon copy of his past performance. The number of unique similarities between his prior conduct and his conduct in the present offenses far outweigh and are much more significant than the few variables to which he points. The evidence of his past performance dispelled any doubt that Miss DeHaaff's positive identification of him was correct.

We say "up to a point" because it must be remembered that defendant was originally sentenced to death for the previous offenses and that that sentence was commuted to life imprisonment for the principal reason that in the prior offenses defendant did not kill his victim. Now, some 20 years later, it can reasonably be inferred that defendant added one step to his particular M.O. and that was to kill the victim by suffocation and drowning to prevent his identification and reincarceration.

Thus in the case of Miss DeHaaff we see that pattern clearly developed only to be interrupted by the noise of a closing door. When we look at the evidence of the George murder, a vivid picture of that pattern unfolds. Although Mrs. George's lips are forever sealed, it takes no great

imagination to visualize her on her hands and knees using a flashlight in an effort to locate defendant's "lost watch stem." We conclude that admission of the evidence of the prior offenses was not an abuse of discretion and that no miscarriage of justice has occurred.

## THE MURDER VICTIM'S HABIT OF SAVING MONEY

■ The prosecution offered two forms of evidence to establish that Mrs. George had money hidden in the bedroom, (1) members of her family testified to her past habit of doing so, and (2) these family members testified that she stated that she intended to make certain purchases.

Again the question is mainly one of relevancy. It has long been held that proof of habit or custom is relevant and admissible to establish that on a given occasion the individual conducted himself or herself in accordance with that habit or custom. (Evid. Code, § 1105; Witkin, Cal. Evidence (2d ed.) pp. 296-297.)

Furthermore it is well established that declarations, albeit hearsay, indicating an intent to act in a particular way in the future, where relevant, are admissible and are competent to prove that the intent was carried out. (*People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627]; *Smith* v. *Slifer,* 1 Cal.App.3d 748 [81 Cal.Rptr. 871]; Witkin, Cal. Evidence (2d ed.) pp. 540-541.)

Here evidence that Mrs. George had a habit of saving money and hiding it in the bedroom coupled with her various declarations that she intended to do so were admissible and constituted substantial evidence that she did in fact have such money concealed in the bedroom. The absence of the money after the murder provided a basis for the jury's finding that she was killed in the course of a robbery.

## THE JURY INSTRUCTIONS

As a result of the DeHaaff incident defendant was convicted of, among other crimes, attempted murder. He contends that the trial judge improperly instructed the jury that the crime could be based on the felony-murder doctrine. He also argues that it was error to instruct on the felony-murder doctrine as to the murder charge.

■ Defendant is correct in his position that the felony-murder rule has no application to a charge of attempted murder. An attempted murder requires the intent to take a human life—an element which cannot be supplied by the application of the felony-murder rule. (Cf. *People* v. *Snyder,* 15 Cal.2d 706 [104 P.2d 639].)

Contrary to defendant's claim, however, the jury was not instructed that the felony-murder rule was applicable to a charge of attempted murder. The trial judge defined an attempt in terms of CALJIC No. 6.00.[1]

Further the jury was instructed on express malice which was defined as an "intention unlawfully to take human life."

The evidence here supports the jury's finding that the defendant did intend to kill Miss DeHaaff and had gone beyond mere preparation when he was frightened away from the scene. No other inference concerning his intent can reasonably be drawn. While the instructions were not a model of clarity any error was harmless beyond doubt.

■ The trial judge properly instructed the jury on the felony-murder doctrine as it applied to the murder of Mrs. George. Defendant's claim of error in this regard rests on his contention that there was no evidence to support a finding that the killing was in the perpetration of a robbery. This contention in turn rests on his claim that the evidence of Mrs. George's habit of saving money should have been excluded. We have previously rejected that contention.

---

[1] CALJIC No. 6.00 states: "Count 4 alleges the offense of attempted murder of Marie DeHaaff. Murder and its degrees are defined elsewhere in these instructions. An attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. In determining whether or not such an act was done, it is necessary to distinguish between mere preparation, on the one hand, and the actual commencement of the doing of the criminal deed, on the other. Mere preparation, which may consist of planning the offense or of devising, obtaining or arranging the means for its commission, is not sufficient to constitute an attempt; but acts of a person who intends to commit a crime will constitute an attempt where they themselves clearly indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design, the progress of which would be completed unless interrupted by some circumstance not intended in the original design."

## The Judgment

The judgment provides that the sentences on the charges of robbery, burglary and forced oral copulation committed against Miss DeHaaff were to be "merged" and be served concurrently with each other. The single "merged" sentence is to be served concurrently to the charge of attempted murder. These sentences were ordered stayed, the stay to become permanent on completion of the sentence for the murder.

Defendant contends that the judgment must be modified in two ways. First he argues that the charge of attempted murder must be designated to be of the second degree because the jury made no finding as to degree, and secondly, Penal Code section 654 requires a modification of the sentence for the various counts.

Penal Code section 1157 provides that "Whenever a defendant is convicted of a crime which is distinguished into degrees, the jury . . . must find the degree . . . . . Upon the failure of the jury . . . [to do so] . . . the degree of the crime of which the defendant is guilty, shall be deemed to be of the lesser degree." (Also see *People* v. *De Arkland,* 262 Cal.App.2d 802 [69 Cal.Rptr. 144].)

Murder is of course divided into degrees. The punishment for second degree murder is imprisonment for from five years to life in the state prison. The punishment for first degree murder, insofar as is relevant here, is life imprisonment. Penal Code section 664 prescribes that imprisonment for up to 20 years is the punishment for an attempt to commit a crime which itself carries a life sentence.

Hence the punishment for attempted murder is imprisonment from 1 to 20 years regardless of whether the murder attempted would have been, if completed, either first or second degree. The crime of attempted murder is not divided into degrees. No modification of the judgment in that regard is necessary.

The Attorney General agrees that the judgment as to the so-called "merged" sentences must be modified. The Supreme Court of California, however, in *People* v. *Miller,* 18 Cal.3d 873 [135 Cal.Rptr. 653, 558 P.2d 552], held that the distinction between concurrent sentences and "merged" sentences is too fine a one to justify recognition.

■ The thrust of Penal Code section 654 is to preclude punishment under more than one criminal provision. Concurrent sentences for multiple convictions arising out of one act or course of conduct are thereby precluded. *(People* v. *Miller, supra.)*

Under the facts of this case defendant of course could be separately sentenced for crimes committed against the two different victims—Miss DeHaaff and Mrs. George. Those sentences could not be made consecutive because the punishment for the murder was life. (Pen. Code, § 669.)

As to the multiple convictions for crimes against Miss DeHaaff the charge of attempt murder because of a distinctly different criminal objective is separate and divisible from the other offenses of burglary, robbery and forcible oral copulation but the latter three are not separate and distinct from each other and arose out of one indivisible course of conduct.

■ "When a defendant suffers multiple convictions, sentencing for some of which is precluded by operation of section 654, an acceptable procedure is to sentence defendant for each count and stay execution of sentence on certain of the convictions to which section 654 is applicable. Such stay is to be effective pending the successful service of sentence for the more serious conviction, at which time the stay is to become permanent." *(People* v. *Miller, supra,* at p. 886.)

In the instant case it is true that the trial judge stayed the sentences on all but the murder charge. However, the judgment further provides that in the event the murder charge is vacated or reversed on appeal then the other portion of the judgment shall be in effect. It is thus necessary for us to modify the judgment as to that latter portion.

The judgment is modified to provide that as to count II (robbery) and count III (forcible oral copulation) the sentence on each of those counts is stayed pending a successful service of the sentence on count I, the burglary charge, and the stay as to each of those counts is to be permanent upon successful service of the sentence as to count I.

We have considered defendant's other claims of error which allege instances of prosecutorial misconduct and errors by the court in procedural and evidentiary rulings. These contentions are totally devoid of arguable merit and to discuss them would unnecessarily lengthen this

opinion. Defendant was fairly tried and no miscarriage of justice has occurred. (Cal. Const., art. VI, § 13.)

As modified, the judgment is affirmed.

Fleming, Acting P. J., and Beach, J., concurred.

A petition for a rehearing was denied April 26, 1977, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1977.